**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**MIDLAND DIVISION**

| | |
|---|---|
| JYE-CHUN CHANG, derivatively on behalf of PROPETRO HOLDING CORP., <br><br>     Plaintiff, <br><br>     vs. <br><br> DALE REDMAN, JEFFREY SMITH, IAN DENHOLM, SPENCER D. ARMOUR III, STEVEN BEAL, MARK S. BERG, ANTHONY BEST, PRYOR BLACKWELL, SCHUYLER E. COPPEDGE, ALAN E. DOUGLAS, STEPHEN HERMAN, MATTHEW H. HIMLER, PETER LABBAT, ROYCE W. MITCHELL, and JACK B. MOORE, <br><br>     Defendants, <br><br>     and <br><br> PROPETRO HOLDING CORP., <br><br>     Nominal Defendant. | Civil Action No.: 7:20-cv-95 <br><br><br> **DEMAND FOR JURY TRIAL** |

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

<u>**INTRODUCTION**</u>

Plaintiff Jye-Chun Chang ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of ProPetro Holding Corp. ("ProPetro" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Dale Redman, Jeffrey Smith, Ian Denholm, Spencer D. Armour III, Steven Beal, Mark S. Berg, Anthony Best, Pryor Blackwell, Schuyler E. Coppedge, Alan E. Douglas, Stephen Herman, Matthew H. Himler, Peter Labbat, Royce W. Mitchell, and Jack B. Moore (collectively, the "Individual Defendants" and together with ProPetro, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of

ProPetro, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for his complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding ProPetro, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by ProPetro's directors and officers between March 17, 2017 through the present (the "Relevant Period").

2.      ProPetro is an oilfield services company based in Midland, Texas. The Company provides assets and services, including hydraulic fracturing services, to companies engaged in the exploration and production of oil and natural gas.

3.      On February 8, 2017, the Company filed a Registration Statement with the SEC on Form S-1 (the "Registration Statement"), in connection with a planned initial public offering ("IPO"). The Registration Statement was declared effective on March 16, 2017.

4.      On March 17, 2017, the IPO was initiated, and the Company's common stock began trading on the New York Stock Exchange ("NYSE"). Through the IPO, the Company

issued 25 million shares of stock priced at $14.00 per share, and netted proceeds of approximately $175 million.

5.      From March 17, 2017 onward, the Company appeared to experience a steady rate of growth, and seemed poised for continued success. Unbeknownst to the investing public, however, during this period the Individual Defendants caused the Company to engage in a number of improper and undisclosed related party transactions, including inappropriately reimbursing at least $370,000 to the Company's then-Chief Executive Officer ("CEO") and then-Chief Financial Officer ("CFO"), as well as purchasing an iron testing facility from the Company's then-Chief Accounting Officer ("CAO") for roughly $3.6 million. These facts were not reflected in any of the Company's public statements or SEC filings issued during the Relevant Period.

6.      At last, on August 8, 2019, more than two years after ProPetro became a publicly-traded company, the Company issued a press release stating that the Company would be forced to delay the filing of its quarterly report for the fiscal quarter ended June 30, 2019. The press release revealed that the Company's Audit Committee, in connection with an ongoing review of the Company's related party transactions, had discovered certain expenses for which the Company's executive officers had been improperly reimbursed during the Relevant Period. Mysteriously, two of the Audit Committee's four members resigned just weeks before this disclosure, with no explanation. The press release further disclosed that the Company now expected to report a material weakness in its internal controls over financial reporting.

7.      Upon the release of this news, the price of the Company's stock dropped precipitously, from $17.34 at the close of trading on August 8, 2019, to $12.75 per share at the close of trading on August 9, 2019, on high trading volume.

8.      Even more bad news for the Company came on August 16, 2019, when the Company disclosed in a press release that NYSE authorities had informed the Company that as a result of the Company's failure to timely file its quarterly report for the fiscal quarter ended June 30, 2019, the Company was no longer in compliance with the NYSE's listing requirements.

9.      On August 30, 2019, slightly over two weeks after the Company revealed the Audit Committee's investigation, the Company's General Counsel announced his resignation. On this news, the price of the Company's stock fell from $10.65 per share at the close of trading on August 30, 2019, to $9.67 per share at the close of trading on September 3, 2019, representing a loss in value of approximately 9.2%.

10.     On October 9, 2019, the Company issued a press release announcing a significant restructuring of the Company's management. Specifically, Defendant Dale Redman ("Redman") would retain his position as CEO, but he would no longer serve as the Company's principal executive officer. Furthermore, Defendant Jeffrey Smith ("Smith") had stepped down as CFO and had been appointed Chief Administrative Officer of the Company, and Defendant Ian Denholm ("Denholm") had resigned from his position as CAO.

11.     On October 18, 2019, Reuters reported that the Company had become the subject of an SEC investigation into the Company's internal controls and disclosure procedures. On this news, the price of the Company's stock fell from $8.61 per share at the close of trading on October 17, 2019, to $7.91 per share at the close of trading on October 18, 2019, representing a loss in value of approximately 8.1%.

12.     On October 31, 2019, an investor research firm, Culper Research, published a report on ProPetro (the "Culper Research Report") that revealed new details as to the extent of the related party transaction the Individual Defendants had failed to disclose, indicating that the

governance issues at the Company were hardly contained, and further underscoring that the Individual Defendants' representations to the public could not be trusted.[1]

13.     On this news, the price of the Company's stock fell once more, from $8.55 per share at the close of trading on October 30, 2019, to $7.75 per share at the close of trading on October 31, 2019, representing a loss in value of approximately 9.36%.

14.     On November 13, 2019, the Company issued a current report on Form 8-K revealing additional results of the Audit Committee's investigation, and disclosing that there were at least two weaknesses in the Company's internal controls, and revealing the previously undisclosed $3.6 million related party transaction between the Company and Defendant Denholm. Yet, even this disclosure failed to disclose the fact that while serving as CAO of the Company, Defendant Denholm had also served as CFO of another oil and gas company, PBEX, which the Company never acknowledged.

15.     Lastly, on March 16, 2020, the Company issued a press release announcing the resignations, effective March 13, 2020, of Defendants Redman and Smith as CEO and Chief Administrative Officer, respectively. These significant management shakeups further demonstrate the gravity of the scheme described herein.

16.     As of the filing of this complaint, the Company has yet to file its quarterly reports for the fiscal quarters ended June 30, 2019 and September 30, 2019, or its annual report on Form 10-K for the fiscal year ended December 31, 2019.

17.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series

---

[1] https://img1.wsimg.com/blobby/go/cc91fda7-4669-4d1b-81ce-a0b8d77f25ab/downloads/Culper_PUMP_10-31-2019.pdf?ver=1581522252969   (last   visited April 9, 2020).

of materially false and misleading statements regarding the Company's related party transactions and internal controls over its financial reporting. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) certain of the Company's senior management, including the Company's former CEO and former CFO had been improperly reimbursed for at least $370,000; (2) the Individual Defendants had caused the Company to engage in undisclosed related party transactions, including a transaction with the Company's former CAO valued at approximately $3.6 million; (3) the Company had ineffective disclosure controls and procedures; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

18.     The Individual Defendants also breached their fiduciary duties by failing to correct and causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public, while at least three of the Individual Defendants engaged in insider sales, netting proceeds of over $12.5 million.

19.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain internal controls, and caused the Company to fail to timely file certain of its periodic reports with the SEC.

20.     In light of the Individual Defendants' misconduct, which has subjected the Company, its former CEO, its former CFO, and its former CAO to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Western District of Texas (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, the losses from the waste of

corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

21.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, many of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n, Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

23.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

24.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

25.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District,

or an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

26.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

27.     Venue is proper in this District because ProPetro and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

28.     Plaintiff is a current shareholder of ProPetro. Plaintiff has continuously held ProPetro common stock at all relevant times.

### Nominal Defendant ProPetro

29.     Defendant ProPetro is incorporated in Delaware, and its stock trades on the NYSE under the ticker symbol "PUMP." The Company's corporate headquarters are located at 1706 South Midkiff Road, Midland, Texas 79701.

### Defendant Redman

30.     Defendant Redman is a co-founder of ProPetro, and has served as the Company's CEO from 2008, and as a Company director from 2005, until he resigned from his positions with the Company on March 13, 2020. According to the Company's Schedule 14A filed with the SEC on April 23, 2019 (the "2019 Proxy Statement"), as of April 22, 2019, Defendant Redman beneficially owned 1,707,673 shares of the Company's common stock, which represented 1.7% of the Company's outstanding stock as of that date. Given that the price per share of the

Company's common stock at the close of trading on April 22, 2019 was $24.66, Defendant Redman owned approximately $42.1 million worth of ProPetro stock.

31.     For the fiscal year ended December 31, 2018, Defendant Redman received $5,464,397 in compensation from the Company. This included $684,615 in salary, $3,360,534 in stock awards, $1,400,000 in non-equity incentive plan compensation, and $19,248 in all other compensation.

32.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Redman made the following sale of Company stock:

| Date | Number of shares | Price | Proceeds |
|---|---|---|---|
| 3/28/2017 | 370,370 | $       14.00 | $       5,185,180 |

His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

33.     The Company's 2019 Proxy Statement stated the following about Defendant Redman:

> Dale Redman is a co-founder of ProPetro and has been Chief Executive Officer since 2008 and a member of the Board since 2005. Mr. Redman has over 33 years of executive and entrepreneurial experience in the energy services industry. He was a co-founder and Chief Executive Officer of Downhole Injection Systems, LLC, which was sold in 2004. Prior to that, Mr. Redman was President and Chief Executive Officer of Reef Chemical Company from 1993 to 1998. Mr. Redman received a B.B.A. in Finance from Texas Tech University. We believe that Mr. Redman's industry experience and deep knowledge of our business and our customers makes him well suited to serve as Chief Executive Officer and director.

**Defendant Smith**

34.     Defendant Smith is a co-founder of ProPetro, and served as the Company's CFO from 2005 through October 3, 2019, on which date he was appointed as the Company's Chief Administrative Officer. On March 13, 2020, Defendant Smith was removed as Chief Administrative Officer, and instead appointed to the non-executive role of Special Advisor to the CEO. According to the 2019 Proxy Statement, as of April 22, 2019, Defendant Smith beneficially owned 1,142,513 shares of the Company's common stock, which represented 1.1% of the Company's outstanding stock as of that date. Given that the price per share of the Company's common stock at the close of trading on April 22, 2019 was $24.66, Defendant Smith owned approximately $28.1 million worth of ProPetro stock.

35.     For the fiscal year ended December 31, 2018, Defendant Smith received $2,611,119 in compensation from the Company. This included $500,000 in salary, $1,344,232 in stock awards, $750,000 in non-equity incentive plan compensation, and $16,887 in all other compensation.

36.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Smith made the following sale of Company stock:

| Date | Number of shares | Price | Proceeds |
|------|------------------|-------|----------|
| 3/28/2017 | 222,221 | $        14.00 | $        3,111,094 |

His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

37.     The Company's 2019 Proxy Statement stated the following about Defendant Smith:

Jeffrey Smith is a co-founder of ProPetro and has been our Chief Financial Officer since 2005. Mr. Smith has over 33 years of accounting and financial experience. Prior to joining the Company, Mr. Smith served as President of Nittany Enterprises from 1991 to 2005, and before that Mr. Smith served as Chief Financial Officer for Southmark Commercial Management Inc., a national commercial real estate company. Mr. Smith is a licensed certified public accountant. Mr. Smith received a B.B.A. in Finance from Penn State University and a M.B.A. from the University of Michigan.

**Defendant Denholm**

38.     Defendant Denholm served as the Company's CAO from 2017 until he resigned on October 3, 2019. According to the 2019 Proxy Statement, as of April 22, 2019, Defendant Denholm beneficially owned 14,821 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 22, 2019 was $24.66, Defendant Denholm owned approximately $365,485 worth of ProPetro stock.

39.     For the fiscal year ended December 31, 2018, Defendant Denholm received $835,348 in compensation from the Company. This included $214,846 in salary, $135,254 in bonus payments, $235,248 in stock awards, and $250,000 in non-equity incentive plan compensation.

40.     The Company's 2019 Proxy Statement stated the following about Defendant Denholm:

Ian Denholm has served as our Chief Accounting Officer since August 2017. Prior to his appointment, Mr. Denholm served as our Director of Finance, and served as Chief Financial Officer of Academy Drilling from 2011 until its acquisition by ProPetro. Mr. Denholm holds both a Bachelor's and Master's degree in Accounting from Texas Tech University.

**Defendant Armour**

41.     Defendant Spencer D. Armour III ("Armour") has served as a Company director since February 2013. According to the 2019 Proxy Statement, as of April 22, 2019, Defendant Armour beneficially owned 674,575 shares of the Company's common stock. Given that the price

per share of the Company's common stock at the close of trading on April 22, 2019 was $24.66, Defendant Armour owned approximately $16.6 million worth of ProPetro stock.

42.     For the fiscal year ended December 31, 2018, Defendant Armour received $170,777 in compensation from the Company. This included $70,776 in salary and $99,999 in stock awards.

43.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Armour made the following sale of Company stock:

| Date | Number of shares | Price | Proceeds |
|---|---|---|---|
| 3/28/2017 | 81,106 | $ 14.00 | $ 1,135,484 |
| 10/1/2018 | 11,250 | $ 16.89 | $ 190,012 |
| 10/2/2018 | 11,250 | $ 17.38 | $ 195,525 |
| 11/19/2018 | 11,250 | $ 19.50 | $ 219,375 |
| 11/20/2018 | 11,250 | $ 19.11 | $ 215,043 |
| 3/6/2019 | 11,250 | $ 19.12 | $ 215,100 |
| 3/7/2019 | 11,250 | $ 19.35 | $ 217,687 |
| 4/16/2019 | 11,250 | $ 24.10 | $ 271,125 |
| 4/17/2019 | 11,250 | $ 23.82 | $ 267,975 |
| 5/22/2019 | 11,250 | $ 21.90 | $ 246,374 |
| 5/23/2019 | 11,250 | $ 19.82 | $ 222,975 |
| 6/11/2019 | 11,250 | $ 19.38 | $ 218,025 |
| 6/12/2019 | 11,250 | $ 18.52 | $ 208,350 |
| 7/17/2019 | 11,250 | $ 17.51 | $ 196,987 |
| 7/18/2019 | 11,250 | $ 16.99 | $ 191,137 |

Thus, in total, before the fraud was exposed, he sold 238,606 Company shares on inside information, for which he received approximately $4.2 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

44.     The Company's 2019 Proxy Statement stated the following about Defendant

Armour:

> Spencer D. Armour III has served as chairman of the Board since February 2013.
> Mr. Armour has over 30 years of executive and entrepreneurial experience in the
> energy services industry. Mr. Armour has served as President of PT
> Petroleum LLC in Midland, Texas since 2013. He was the Vice President of
> Corporate Development for Basic Energy Services, Inc. from 2007 to 2008, which
> acquired Sledge Drilling Corp., a company Mr. Armour co-founded and served as
> Chief Executive Officer from 2005 to 2006. From 1998 through 2005, he served
> as Executive Vice President of Patterson-UTI Energy, Inc., which acquired Lone
> Star Mud, Inc., a company Mr. Armour founded and served as President from
> 1986 to 1997. He currently serves on the board of Viper Energy Partners, LP and
> the board of CES Energy Solutions Corp. Mr. Armour received a B.S. in
> Economics from the University of Houston in 1977 and served on the University
> of Houston System Board of Regents from 2011 until 2018. We believe that
> Mr. Armour's extensive experience in the energy services industry and his deep
> knowledge of the industry dynamics within the Permian Basin make him well
> suited to serve as a director.

**Defendant Beal**

45.     Defendant Steven Beal ("Beal") served as a Company director from April 2017

until he resigned on July 11, 2019. According to the 2019 Proxy Statement, as of April 22, 2019,

Defendant Beal beneficially owned 29,301 shares of the Company's common stock. Given that

the price per share of the Company's common stock at the close of trading on April 22, 2019 was

$24.66, Defendant Beal owned approximately $722,562 worth of ProPetro stock.

46.     For the fiscal year ended December 31, 2018, Defendant Beal received $169,999

in compensation from the Company. This included $70,000 in salary and $99,999 in stock awards.

47.     The Company's 2019 Proxy Statement stated the following about Defendant Beal:

> Steven Beal has served as a member of our board of directors since April 2017.
> Mr. Beal has over 30 years of experience in energy industry and accounting
> activities. Mr. Beal served as a consultant to Concho Resources Inc. from 2009 to
> 2013, and, prior to that, served as the President and Chief Operating Officer of
> Concho Resources Inc. from its formation in 2004 until his retirement in 2009.
> Previously, Mr. Beal was a director and the Executive Vice President and Chief
> Financial Officer of Concho Oil & Gas Corp. from its formation until becoming

its President and Chief Operating Officer in 2002, a position he held until 2004. Prior to Concho Oil & Gas Corp., Mr. Beal was a director and the Vice President and Chief Financial Officer of Concho Resources Inc., a predecessor company to Concho Resources Inc., from its formation in 1997 until its sale in 2001. From 1988 to 1997, Mr. Beal was employed by Parker & Parsley Petroleum Company in a variety of capacities, including serving as Senior Vice President and Chief Financial Officer. From 1981 to 1988, Mr. Beal was employed by the accounting firm currently known as PricewaterhouseCoopers. Mr. Beal currently serves on the board of directors of Concho Resources Inc. and First Financial Bankshares, Inc. Mr. Beal received a Bachelor of Business Administration in accounting from the University of Texas. We believe that Mr. Beal's extensive knowledge of the energy industry, together with his substantial experience with public company accounting matters make him well suited to serve as a director.

**Defendant Berg**

48.     Defendant Mark S. Berg ("Berg") has served as a Company Director since February 2019.

49.     The Company's 2019 Proxy Statement stated the following about Defendant Berg:

Mark. S. Berg has served as a member of the Board since February 2019. Mr. Berg has served as Executive Vice President, Corporate/Vertically Integrated Operations for Pioneer since May 2017. Mr. Berg has over 14 years of experience with Pioneer in various roles, including as Executive Vice President & General Counsel from April 2005 to January 2014, Executive Vice President, Corporate from January 2014 to August 2015, and as Executive Vice President, Corporate/Operations from August 2015 until assuming his current role. He began his career in 1983 with the law firm Vinson & Elkins LLP, and served as partner from 1990 to 1997. Further, Mr. Berg served as Executive Vice President, General Counsel and Secretary of American General Corporation, a Fortune 200 diversified financial services company, from 1997 to 2001. Following the sale of American General to American International Group, he was appointed Senior Vice President, General Counsel and Secretary of Hanover Compressor Company, a New York Stock Exchange listed natural gas compression and processing company. Mr. Berg holds a Juris Doctor, with honors, from the University of Texas School of Law, and graduated magna cum laude and Phi Beta Kappa with a Bachelor of Arts in Public Policy from Tulane University. He is a member of the State Bar of Texas and has served as Chairman of the Board of Dallas CASA. Mr. Berg has served as a member of the board of directors of HighPoint Resources Corporation since March 2018. We believe that Mr. Berg's experience in significant management roles with Pioneer and his broad experience in the energy industry make him well suited to serve as a director.

**Defendant Best**

50.    Defendant Anthony Best ("Best") has served as a Company Director since January 2018. He also serves as the Chair of the Company's Audit Committee and as a member of the Compensation Committee. According to the 2019 Proxy Statement, as of April 22, 2019, Defendant Best beneficially owned 8,149 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 22, 2019 was $24.66, Defendant Best owned approximately $200,954 worth of ProPetro stock.

51.    For the fiscal year ended December 31, 2018, Defendant Best received $176,984 in compensation from the Company. This included $50,721 in salary and $126,263 in stock awards.

52.    The Company's 2019 Proxy Statement stated the following about Defendant Best:

Anthony Best has served as a member of the Board since January 2018. Mr. Best has over 35 years of experience in the energy industry, and has served as a Senior Advisor for Quantum Energy Partners ("Quantum") since August 2015. Prior to joining Quantum, Mr. Best served in various roles with SM Energy Company, commencing in 2006 as its President and Chief Operating Officer, and as its Chief Executive Officer from February 2007 through January 2015. From 2003 to 2005, Mr. Best served as President and Chief Executive Officer of Pure Resources, Inc., a Unocal development and exploration company. From 2000 to 2003, Mr. Best served as an independent consultant offering leadership and oil and gas consultation to energy companies and volunteer organizations, and from 1979 through 2000, Mr. Best served in various roles of increasing responsibility at Atlantic Richfield Company, culminating in the position of President, ARCO Latin America. Mr. Best holds a Master's of Science in Engineering Management from the University of Alaska, and a Bachelor's of Science in Mechanical Engineering from Texas A&M University. Prior to beginning his business career, Mr. Best served five years as an engineering officer in the United States Air Force. Mr. Best currently serves as a director of ExL Petroleum LP, Middle Fork Energy Partners and Newpark Resources. We believe that Mr. Best's experience in significant management roles with companies operating in the Permian Basin and his broad experience in the energy industry make him well suited to serve as a director.

**Defendant Blackwell**

53.     Defendant Pryor Blackwell ("Blackwell") has served as a Company director since December 2017. He also serves as the Chair of the Company's Compensation Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2019 Proxy Statement, as of April 22, 2019, Defendant Blackwell beneficially owned 37,575 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 22, 2019 was $24.66, Defendant Blackwell owned approximately $926,599 worth of ProPetro stock.

54.     For the fiscal year ended December 31, 2018, Defendant Blackwell received $219,920 in compensation from the Company. This included $64,222 in salary and $155,698 in stock awards.

55.     The Company's 2019 Proxy Statement stated the following about Defendant Blackwell:

> Pryor Blackwell has served as a member of the Board since December 2017. Mr. Blackwell has over 30 years of experience as an entrepreneur and senior executive in the commercial real estate development and investment business. Mr. Blackwell is a partner with Bandera Ventures, a private commercial real estate development and investment firm, which he co-founded in 2003. Prior to founding Bandera Ventures, Mr. Blackwell was employed by Trammell Crow Company for 18 years where he served in numerous leadership capacities, including: President—Development & Investment Group from 2001 to 2003, Chief Operating Officer from 1998 to 2001, Chief Operating Officer—Western Operations from 1997 to 1998, Area President from 1996 to 1997, President/Chief Executive Officer—DFW from 1993 to 1997, President/Chief Executive Officer—Central Office Group from 1991 to 1993, and Partner from 1987 to 1991. Mr. Blackwell was a member of the Trammell Crow Company Executive Committee, Operating Committee, Investment Committee, and served on the Board of Directors from 1993 to 2002. Mr. Blackwell holds a Bachelor of Business Administration degree in Finance from Texas Tech University. We believe that Mr. Blackwell's financial and investment experience provides a diverse perspective from outside the energy industry and makes him well suited to serve as a director.

**Defendant Coppedge**

56.     Defendant Schuyler E. Coppedge ("Coppedge") served as a Company director from March 2013 until he resigned on May 18, 2018.

57.     The Company's Schedule 14A filed with the SEC on April 26, 2018 (the "2018 Proxy Statement") stated the following about Defendant Coppedge:

> Schuyler E. Coppedge has served as a member of our board of directors since March 2013. Mr. Coppedge is a Partner at Energy Capital Partners where he has worked since 2005. Mr. Coppedge has over 20 years of experience in energy industry finance and investment activities, with a particular emphasis on oil field services, midstream oil and gas and renewable power generation. Prior to joining Energy Capital in 2005, Mr. Coppedge spent over six years at JP Morgan. In addition to ProPetro, Mr. Coppedge currently serves on the boards of CIG Logistics, STEAG-SCR Tech, Terra-Gen, LLC and USD Partners LP and as an observer to NCSG Crane & Heavy Haul Corporation. Mr. Coppedge also served on the board of FirstLight Power Enterprises, Inc. Mr. Coppedge received a B.A. in history from Middlebury College and an M.B.A. in finance from the Wharton School at the University of Pennsylvania. Mr. Coppedge was selected to serve as a director on the board due to his affiliation with Energy Capital Partners and we believe his extensive experience across the finance and energy sectors makes him well suited to serve as a director.

**Defendant Douglas**

58.     Defendant Alan E. Douglas ("Douglas") has served as a Company director since March 2017. He also serves as a member of the Company's Audit Committee and Nominating and Corporate Governance Committee. According to the 2019 Proxy Statement, as of April 22, 2019, Defendant Douglas beneficially owned 14,301 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 22, 2019 was $24.66, Defendant Douglas owned approximately $352,662 worth of ProPetro stock.

59.     For the fiscal year ended December 31, 2018, Defendant Douglas received $154,999 in compensation from the Company. This included $55,000 in salary and $99,999 in stock awards.

60.     The Company's 2019 Proxy Statement stated the following about Defendant

Douglas:

> Alan E. Douglas has served as a member of the Board since March 2017. Mr. Douglas is a shareholder of Johnson, Miller & Co. where he has worked for 25 years. Mr. Douglas is a Certified Public Accountant with over 37 years of experience in accounting and audit activities. Prior to joining Johnson, Miller & Co., Mr. Douglas was a Certified Public Accountant at KPMG LLP for twelve years. Mr. Douglas received a B.B.A. in accounting from Texas Tech University. We believe that Mr. Douglas's extensive accounting and auditing experience make him well suited to serve as a director.

**Defendant Herman**

61.     Defendant Stephen Herman ("Herman") served as a Company director from

March 2013 until he resigned on December 1, 2017.

62.     The Registration Statement stated the following about Defendant Herman:

> Stephen Herman has served as a director of ProPetro since March 2013. Mr. Herman has served as a Managing Director at Energy Capital Partners since 2005. Mr. Herman has over 43 years of energy industry experience, with a particular emphasis on renewable and fossil generation and environmental and oil field services. Prior to joining Energy Capital Partners in 2005, Mr. Herman was Senior Energy Counsel for Goldman Sachs. Mr. Herman was also the Senior Vice President and General Counsel of PG&E National Energy Group and its predecessor, U.S. Generating Company. Mr. Herman was also previously a Partner at Latham & Watkins and Kirkland & Ellis. Mr. Herman currently serves on the boards of ADA Carbon Solutions LLC, STEAG-SCR Tech, EnergySolutions, Inc. and Granite Holdings, Inc. (the parent company of Wheelabrator Technologies, Inc.). Mr. Herman has also served on the boards of FirstLight Resources Inc., NextLight Renewable Power, LLC, PLH Group, Inc., Power Holdings of Illinois, LLC and Ice Energy, Inc. Mr. Herman received a B.S. in Economics from the Wharton School of Finance and Commerce at the University of Pennsylvania and an LL.B. from the University of Virginia Law School. Mr. Herman was selected to serve as a director on the board due to his affiliation with Energy Capital Partners, his extensive experience in the law and finance, and his history in the energy industry.

**Defendant Himler**

63.     Defendant Matthew H. Himler ("Himler") served as a Company director from

October 2016 until he resigned on January 29, 2018.

64.     The Registration Statement stated the following about Defendant Himler:

Matthew H. Himler has served as a director of ProPetro since October 2016 and was appointed to the board in connection with his affiliation with Energy Capital Partners. Mr. Himler has served as Vice President at Energy Capital Partners since 2012. Mr. Himler has over 7 years of experience in energy industry investment and finance activities. In addition to ProPetro, Mr. Himler serves on the board of NESCO Holdings LP and is an observer to NCSG Crane and Heavy Haul Corporation. Prior to joining Energy Capital Partners in 2012, Mr. Himler was an analyst at Lazard Frères & Co. Mr. Himler received a B.A. in Economics and Political Science from Amherst College. Mr. Himler was selected to serve as a director on the board due to his affiliation with Energy Capital Partners and his experience in investment activities within the oilfield and energy services sectors.

**Defendant Labbat**

65.     Defendant Peter Labbat ("Labbat") served as a Company director from March 2013 until he resigned on May 18, 2018.

66.     The Company's 2018 Proxy Statement stated the following about Defendant Labbat:

Peter Labbat has served as a member of our board of directors since March 2013. Mr. Labbat has served as a Partner of Energy Capital Partners since 2006. Mr. Labbat has over 27 years of financial and investment experience and specializes in the energy and power sectors. Prior to joining Energy Capital Partners in 2006, Mr. Labbat was a Managing Director at Goldman, Sachs & Co. He currently serves on the boards of ADA Carbon Solutions, LLC, Next Wave Energy Partners, LP, and Summit Midstream Partners, LP. Mr. Labbat has also served on the boards of NextLight Renewable Power, LLC, Odessa Power Holdings, LLC, Ice Energy, Inc., Chieftain Sand and Proppant, LLC and Red Oak Power Holdings, LLC. Mr. Labbat received a B.A. in Economics from Georgetown University and an M.B.A. from the Wharton School at the University of Pennsylvania. Mr. Labbat was selected to serve as a director on the board due to his affiliation with Energy Capital Partners and we believe that Mr. Labbat's extensive experience across the finance and energy sectors make him well suited to serve as a director.

**Defendant Mitchell**

67.     Defendant Royce W. Mitchell ("Mitchell") served as a Company director from February 2019 until he resigned on July 28, 2019. According to the 2019 Proxy Statement, as of

April 22, 2019, Defendant Mitchell beneficially owned 1,958 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 22, 2019 was $24.66, Defendant Mitchell owned approximately $48,284 worth of ProPetro stock.

68.     The Company's 2019 Proxy Statement stated the following about Defendant Mitchell:

> Royce W. Mitchell has served as a member of the Board since February 2019. Mr. Mitchell has been an Executive Consultant, focusing on advising management teams and board audit committees of exploration and production companies, since January 2005, except for the period from April 2008 through December 2008 when he served as Chief Financial Officer of Frac Tech Services, Ltd. Mr. Mitchell served as an Executive Vice President, Chief Financial Officer and Chief Accounting Officer of Key Energy Services, Inc. ("Key") from January 2002 to January 2005. Before joining Key, he was a Partner of KPMG LLP from April 1986 to December 2001 specializing in the oil and gas industry. Mr. Mitchell received a BBA from Texas Tech University and is a Certified Public Accountant. Mr. Mitchell has served as a member of Pioneer's Board of Directors since July 2014. We believe that Mr. Mitchell's extensive knowledge of the energy industry, together with his substantial experience with public company accounting matters make him well suited to serve as a director.

**Defendant Moore**

69.     Defendant Jack B. Moore ("Moore") has served as a Company director since March 2017. He also serves as the Chair of the Company's Nominating and Corporate Governance Committee, and as a member of the Company's Compensation Committee and Audit Committee. According to the 2019 Proxy Statement, as of April 22, 2019, Defendant Moore beneficially owned 14,301 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 22, 2019 was $24.66, Defendant Moore owned approximately $352,662 worth of ProPetro stock.

70.     For the fiscal year ended December 31, 2018, Defendant Moore received $164,999 in compensation from the Company. This included $65,000 in salary and $99,999 in stock awards.

71.   The Company's 2019 Proxy Statement stated the following about Defendant

Moore:

> Jack B. Moore has served as a member of the Board since March 2017. Mr. Moore
> served as Chairman of the Board of Cameron International Corporation from 2011
> until it was acquired in April 2016. Mr. Moore worked at Cameron International
> Corporation from 1999 until 2014, serving as Chief Executive Officer from 2008
> to 2015 and as President from 2008 to 2014. Prior to that, he held various
> management positions at Baker Hughes Incorporated, where he was employed for
> 23 years. Mr. Moore currently serves on the board of directors of Occidental
> Petroleum Corporation and KBR, Inc., and served on the board of directors of
> Rowan Companies plc prior to its merger with Ensco plc in April 2019. Mr. Moore
> also previously served on the board of directors of the American Petroleum
> Institute, the National Ocean Industries Association, and the Petroleum Equipment
> Suppliers Association. Mr. Moore received a B.B.A. from the University of
> Houston and is a graduate of the Advanced Management Program at Harvard
> Business School. We believe that Mr. Moore's wealth of experience in the oilfield
> service sector, including service as a director and executive officer to various
> public corporations in the sector make him well suited to serve as a director.

72.   The Individual Defendants possessed the power and authority to control the

contents of the Company's SEC filings, press releases, and other market communications. The

Individual Defendants were provided with copies of the Company's SEC filings and press

releases alleged herein to be misleading prior to or shortly after their issuance and had the ability

and opportunity to prevent their issuance or to cause them to be corrected. Because of their

positions with the Company, and their access to material information available to them but not to

the public, the Individual Defendants knew that the adverse facts specified herein had not been

disclosed to and were being concealed from the public, and that the positive representations being

made were then materially false and misleading. The Individual Defendants are liable for the false

statements and omissions pleaded herein.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

73.   By reason of their positions as officers, directors, and/or fiduciaries of ProPetro

and because of their ability to control the business and corporate affairs of ProPetro, the Individual

Defendants owed ProPetro and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage ProPetro in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of ProPetro and its shareholders so as to benefit all shareholders equally.

74.     Each director and officer of the Company owes to ProPetro and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

75.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of ProPetro, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

76.     To discharge their duties, the officers and directors of ProPetro were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

77.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of ProPetro, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

78.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

79.     To discharge their duties, the officers and directors of ProPetro were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of ProPetro were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Texas and the United States, and pursuant to ProPetro's own Code of Ethics and Conduct (the "Code of Ethics");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how ProPetro conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make

reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of ProPetro and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that ProPetro's operations would comply with all applicable laws and ProPetro's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

80.     Each of the Individual Defendants further owed to ProPetro and the shareholders the duty of loyalty requiring that each favor ProPetro's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

81.     At all times relevant hereto, the Individual Defendants were the agents of each other and of ProPetro and were at all times acting within the course and scope of such agency.

82.     Because of their advisory, executive, managerial, and directorial positions with ProPetro, each of the Individual Defendants had access to adverse, non-public information about the Company.

83.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by ProPetro.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

84.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

85.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Sections 14(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

86.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance

of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

87.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

88.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants, and of ProPetro, and was at all times acting within the course and scope of such agency.

## PROPETRO'S CODE OF ETHICS

89.     The Company's Code of Ethics provides that it was adopted to encourage the following:

- Honest and ethical conduct, including fair dealing and the ethical handling of actual or apparent conflicts of interest;
- Full, fair, accurate, timely and understandable disclosure;
- Compliance with applicable governmental laws, rules and regulations;
- Prompt internal reporting of any violations of law or the Code;
- Accountability for adherence to the Code, including fair process by which to determine violations;
- Consistent enforcement of the Code, including clear and objective standards for compliance; and
- Protection for persons reporting any such questionable behavior.

90.     The Code of Ethics states that "[a]ll directors, officers and employees (each a "Covered Party" and, collectively, the "Covered Parties") of the Company and all of its subsidiaries are expected to be familiar with the Code and to adhere to those principles and procedures set forth below."

91.    In a section titled, "Conflicts of Interest," the Code of Ethics provides that the Company's officers and directors have a duty to conduct business in an honest and ethical manner, and must disclose any conflicts of interest promptly, stating:

> A conflict of interest occurs when the private interests of a Covered Party interfere, or appear to interfere, with the interests of the Company as a whole. For example, a conflict of interest can arise when a Covered Party takes actions or has personal interests that make it difficult to perform his or her Company duties objectively and effectively. A conflict of interest may also arise when a Covered Party, or a member of his or her immediate family,1 receives improper personal benefits as a result of his or her position at the Company.

> Conflicts of interest can also occur indirectly. For example, a conflict of interest may arise when a Covered Party is also an executive officer, a major shareholder or has a material interest in a company or organization doing business with the Company.

> Each Covered Party has an obligation to conduct the Company's business in an honest and ethical manner, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships. Any situation that involves, or may reasonably be expected to involve, a conflict of interest with the Company, should be disclosed promptly to the Company's Audit Committee of the Board or the General Counsel.

> This Code does not attempt to describe all possible conflicts of interest that could develop. Other common conflicts from which Covered Parties must refrain are set out below:

> - Covered Parties may not engage in any conduct or activities that are inconsistent with the Company's best interests or that disrupt or impair the Company's relationship with any person or entity with which the Company has or proposes to enter into a business or contractual relationship.
> - Covered Parties may not accept compensation, in any form, for services performed for the Company from any source other than the Company.
> - No Covered Party may take up any management or other employment position with, or have any material interest in, any firm or company that is in direct or indirect competition with the Company.

> Nothing in this Code of Conduct shall be read to supersede or conflict with Section Eleventh of the Company's Certificate of Incorporation (as may be amended from time to time in accordance with the terms thereof).

92.     In a section titled, "Disclosures," the Code of Ethics provides that all of the

Company's SEC filings "must be full, fair, accurate, timely and understandable," stating:

> The information in the Company's public communications, including in all reports
> and documents filed with or submitted to the SEC, must be full, fair, accurate,
> timely and understandable.
>
> To ensure the Company meets this standard, all Covered Parties (to the extent they
> are involved in the Company's disclosure process) are required to maintain
> familiarity with the disclosure requirements, processes and procedures applicable
> to the Company commensurate with their duties. Covered Parties are prohibited
> from knowingly misrepresenting, omitting or causing others to misrepresent or
> omit, material facts about the Company to others, including the Company's
> independent auditors, governmental regulators and self-regulatory organizations.

93.     In a section titled, "Compliance with Laws, Rules and Regulations," the Code of

Ethics provides that the Company's officers and directors are required to comply with all

applicable laws, rules, and regulations, stating:

> The Company is obligated to comply with all applicable laws, rules and
> regulations. It is the personal responsibility of each Covered Party to adhere to the
> standards and restrictions imposed by these laws, rules and regulations in the
> performance of his or her duties for the Company. The Chief Executive Officer,
> Chief Financial Officer and Chief Accounting Officer or Controller (or persons
> performing similar functions) of the Company (together, the "Senior Financial
> Officers") are also required to promote compliance by all employees with the Code
> and to abide by Company standards, policies and procedures.

94.     In a section titled, "Reporting, Accountability and Enforcement," the Code of

Ethics provides that the Company's officers and directors are required to "promptly report

suspected violations of laws, rules, regulations or the Code," stating:

> The Company promotes ethical behavior at all times and encourages Covered
> Parties to talk to supervisors, managers and other appropriate personnel, including
> the Company's officers, the General Counsel, outside counsel for the Company
> and the Board or the relevant committee thereof, when in doubt about the best
> course of action in a particular situation.
>
> Covered Parties should promptly report suspected violations of laws, rules,
> regulations or the Code or any other unethical behavior by any director, officer,
> employee or anyone purporting to be acting on the Company's behalf to

appropriate personnel, including officers, the General Counsel, outside counsel for the Company and the Board or the relevant committee thereof. Reports may be made anonymously. If requested, confidentiality will be maintained, subject to applicable law, regulations and legal proceedings.

The Audit Committee of the Board shall investigate and determine, or shall designate appropriate persons to investigate and determine, the legitimacy of such reports. The Audit Committee will then determine the appropriate disciplinary action. Such disciplinary action includes, but is not limited to, reprimand, termination with cause, and possible civil and criminal prosecution.

To encourage employees to report any and all violations, the Company will not tolerate retaliation for reports made in good faith. Retaliation or retribution against any Covered Party for a report made in good faith of any suspected violation of laws, rules, regulations or this Code is cause for appropriate disciplinary action.

95.     The Individual Defendants violated the Code of Ethics by engaging in or permitting the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including , including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Section 14(a) of the Exchange Act, and failing to report the same. Additionally, three of the Individual Defendants violated the Code of Ethics by engaging in lucrative insider sales. Also in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

96.     ProPetro is a Texas-based oil services company, and purports to provide hydraulic fracturing and other related services to companies engaged in oil and natural gas production. The Company primarily operates out of the Permian Basin, which contains the Mid-Continent Oil Field, one of the largest and highest-producing oil fields in the U.S.

97.     Prior to the beginning of the Relevant Period, ProPetro was a private company. In early 2017, however, the Company's management began to act on plans to take the Company public, by way of the IPO.

98.     On February 8, 2017, the Company filed the Registration Statement with the SEC, in connection with the IPO. The Registration Statement was signed by Defendants Redman, Smith, Armour, Coppedge, Herman, Himler, and Labbat.

99.     The Registration statement addressed the subject of related party transactions in a section titled, "Procedures for Review, Approval and Ratification of Related Person Transactions," stating:

> Our Board of directors will adopt a code of business conduct and ethics in connection with the completion of this offering that will provide that the board of directors or its authorized committee will review on at least a quarterly basis all transactions with related persons that are required to be disclosed under SEC rules and, when appropriate, initially authorize or ratify all such transactions. In connection with this offering, we will establish an audit committee consisting solely of independent directors whose functions will be set forth in the audit committee charter. We anticipate that one of the audit committee's functions will be to review and approve all relationships and transactions in which we and our directors, director nominees and executive officers and their immediate family members, as well as holders of more than 5% of any class of our voting securities and their immediate family members, have a direct or indirect material interest. We anticipate that such policy will be a written policy included as part the audit committee charter that will be implemented by the audit committee and in the Code of Business Conduct and Ethics that our board of directors will adopt prior to the completion of this offering.
>
> The code of business conduct and ethics will provide that, in determining whether or not to recommend the initial approval or ratification of a transaction with a related person, the board of directors or its authorized committee should consider all of the relevant facts and circumstances available, including (if applicable) but not limited to: (i) whether there is an appropriate business justification for the transaction; (ii) the benefits that accrue to us as a result of the transaction; (iii) the terms available to unrelated third parties entering into similar transactions; (iv) the impact of the transaction on a director's independence (in the event the related person is a director, an immediate family member of a director or an entity in which a director or an immediate family member of a director is a partner, shareholder, member or executive officer); (v) the availability of other sources for

comparable services; (vi) whether it is a single transaction or a series of ongoing, related transactions; and (vii) whether entering into the transaction would be consistent with the code of business conduct and ethics.

The code of business conduct and ethics described above will be adopted in connection with the completion of this offering and, therefore, the transactions described below were not reviewed under such policy.

100.    The Registration Statement also addressed the Company's internal controls in a

section titled, "Risks Inherent in Our Business," stating:

The requirements of being a public company, including compliance with the reporting requirements of the Exchange Act and the requirements of the Sarbanes-Oxley Act and the NYSE, may strain our resources, increase our costs and distract management, and we may be unable to comply with these requirements in a timely or cost-effective manner.

As a public company, we will need to comply with new laws, regulations and requirements, certain corporate governance provisions of the Sarbanes-Oxley Act of 2002, related regulations of the SEC and the requirements of the NYSE, with which we are not required to comply as a private company.

* * *

We will be required to comply with certain provisions of Section 404 of the Sarbanes-Oxley Act as early as our fiscal year ending December 31, 2018. Section 404 requires that we document and test our internal control over financial reporting and issue management's assessment of our internal control over financial reporting. This section also requires that our independent registered public accounting firm opine on those internal controls upon becoming a large accelerated filer, as defined in the SEC rules, or otherwise ceasing to qualify as an emerging growth company under the JOBS Act. We are evaluating our existing controls against the standards adopted by the Committee of Sponsoring Organizations of the Treadway Commission. During the course of our ongoing evaluation and integration of the internal control over financial reporting, we may identify areas requiring improvement, and we may have to design enhanced processes and controls to address issues identified through this review. For example, we anticipate the need to hire additional administrative and accounting personnel to conduct our financial reporting.

We cannot be certain at this time that we will be able to successfully complete the procedures, certification and attestation requirements of Section 404 or that we or our independent registered public accounting firm will not identify material weaknesses in our internal control over financial reporting. If we fail to comply with the requirements of Section 404 or if we or our independent registered public accounting firm identify and report such material weaknesses, the accuracy and

timeliness of the filing of our annual and quarterly reports may be materially adversely affected and could cause investors to lose confidence in our reported financial information, which could have a negative effect on the stock price of our common stock. In addition, a material weakness in the effectiveness of our internal control over financial reporting could result in an increased chance of fraud and the loss of customers, reduce our ability to obtain financing and require additional expenditures to comply with these requirements, each of which could have a material adverse effect on our business, results of operations and financial condition.

101.    Applicable SEC rules and regulations require that all Registration Statements must disclose any known trends, events, or uncertainties that have had or are reasonably likely to have a materially favorable or unfavorable impact on the issuing company and its operations.

102.    On March 16, 2017, the Registration Statement was declared effective. That same day, the Company issued a press release announcing that through the IPO, the Company would issue 25 million shares of common stock, priced at $14.00 per share, and that the net proceeds from the IPO would be used "to repay borrowings outstanding under the Company's term loan, to fund the purchase of additional hydraulic fracturing units and for general corporate purposes."

103.    On March 17, 2017, the IPO was initiated, and ProPetro's stock began trading on the NYSE. Through the IPO, the Company netted proceeds of roughly $175 million.

104.    Throughout the Relevant Period, unbeknownst to the investing public, the Individual Defendants caused the Company to improperly reimburse at least $370,000 to members of the Company's management, including Defendants Redman and Smith, and to engage in undisclosed related party transactions with Defendant Denholm valued at roughly $3.6 million. Additionally, while serving as CAO of ProPetro, Defendant Denholm simultaneously served as CFO of PBEX, an oil and gas company with overlapping business relationships with the Company, which the Individual Defendants never disclosed. As a result, the Company's internal controls were inadequate during the Relevant Period.

**The Individual Defendants' Duty to Disclose**

105.    SEC Regulation S-K imposes certain affirmative disclosure requirements on public companies, such as ProPetro, with respect to their internal controls and any related party transactions. Specifically, Item 308 of SEC Regulation S-K, 17 CFR 229.308(a)(3) provides that a public company's annual report on its internal controls must contain:

> Management's assessment of the effectiveness of the registrant's internal control over financial reporting as of the end of the registrant's most recent fiscal year, including a statement as to whether or not internal control over financial reporting is effective. This discussion must include disclosure of any material weakness in the registrant's internal control over financial reporting identified by management. Management is not permitted to conclude that the registrant's internal control over financial reporting is effective if there are one or more material weaknesses in the registrant's internal control over financial reporting.

106.    Item 404 of SEC Regulation S-K, 17 CFR § 229.404 provides, with respect to the disclosure of related party transactions, that public companies must disclose:

> any transaction, since the beginning of the registrant's last fiscal year, or any currently proposed transaction, in which the registrant was or is to be a participant and the amount involved exceeds $120,000, and in which any related person had or will have a direct or indirect material interest.

107.    As such, the Individual Defendants had a duty under Regulation S-K to disclose to the public the internal controls failures and undisclosed related party transactions described herein.

**False and Misleading Statements**

*March 20, 2017 Prospectus*

108.    On March 20, 2017, the Company filed with the SEC a prospectus on Form 424B4 (the "March 2017 Prospectus"), which forms part of the Registration Statement. The March 2017 Prospectus made the same representations as the Registration Statement with respect to the Company's transactions with related parties and the Company's internal controls.

109.   With respect to the Company's transactions with related parties, the March 2017 Prospectus stated:

> Our Board of directors will adopt a code of business conduct and ethics in connection with the completion of this offering that will provide that the board of directors or its authorized committee will review on at least a quarterly basis all transactions with related persons that are required to be disclosed under SEC rules and, when appropriate, initially authorize or ratify all such transactions. In connection with this offering, we will establish an audit committee consisting solely of independent directors whose functions will be set forth in the audit committee charter. We anticipate that one of the audit committee's functions will be to review and approve all relationships and transactions in which we and our directors, director nominees and executive officers and their immediate family members, as well as holders of more than 5% of any class of our voting securities and their immediate family members, have a direct or indirect material interest. We anticipate that such policy will be a written policy included as part the audit committee charter that will be implemented by the audit committee and in the Code of Business Conduct and Ethics that our board of directors will adopt prior to the completion of this offering.

> The code of business conduct and ethics will provide that, in determining whether or not to recommend the initial approval or ratification of a transaction with a related person, the board of directors or its authorized committee should consider all of the relevant facts and circumstances available, including (if applicable) but not limited to: (i) whether there is an appropriate business justification for the transaction; (ii) the benefits that accrue to us as a result of the transaction; (iii) the terms available to unrelated third parties entering into similar transactions; (iv) the impact of the transaction on a director's independence (in the event the related person is a director, an immediate family member of a director or an entity in which a director or an immediate family member of a director is a partner, shareholder, member or executive officer); (v) the availability of other sources for comparable services; (vi) whether it is a single transaction or a series of ongoing, related transactions; and (vii) whether entering into the transaction would be consistent with the code of business conduct and ethics.

> The code of business conduct and ethics described above will be adopted in connection with the completion of this offering and, therefore, the transactions described below were not reviewed under such policy.

110.   With respect to the Company's internal controls, the March 2017 Prospectus stated:

> The requirements of being a public company, including compliance with the reporting requirements of the Exchange Act and the requirements of the Sarbanes-

Oxley Act and the NYSE, may strain our resources, increase our costs and distract management, and we may be unable to comply with these requirements in a timely or cost-effective manner.

 As a public company, we will need to comply with new laws, regulations and requirements, certain corporate governance provisions of the Sarbanes-Oxley Act of 2002, related regulations of the SEC and the requirements of the NYSE, with which we are not required to comply as a private company.

* * *

We will be required to comply with certain provisions of Section 404 of the Sarbanes-Oxley Act as early as our fiscal year ending December 31, 2018. Section 404 requires that we document and test our internal control over financial reporting and issue management's assessment of our internal control over financial reporting. This section also requires that our independent registered public accounting firm opine on those internal controls upon becoming a large accelerated filer, as defined in the SEC rules, or otherwise ceasing to qualify as an emerging growth company under the JOBS Act. We are evaluating our existing controls against the standards adopted by the Committee of Sponsoring Organizations of the Treadway Commission. During the course of our ongoing evaluation and integration of the internal control over financial reporting, we may identify areas requiring improvement, and we may have to design enhanced processes and controls to address issues identified through this review. For example, we anticipate the need to hire additional administrative and accounting personnel to conduct our financial reporting.

We cannot be certain at this time that we will be able to successfully complete the procedures, certification and attestation requirements of Section 404 or that we or our independent registered public accounting firm will not identify material weaknesses in our internal control over financial reporting. If we fail to comply with the requirements of Section 404 or if we or our independent registered public accounting firm identify and report such material weaknesses, the accuracy and timeliness of the filing of our annual and quarterly reports may be materially adversely affected and could cause investors to lose confidence in our reported financial information, which could have a negative effect on the stock price of our common stock. In addition, a material weakness in the effectiveness of our internal control over financial reporting could result in an increased chance of fraud and the loss of customers, reduce our ability to obtain financing and require additional expenditures to comply with these requirements, each of which could have a material adverse effect on our business, results of operations and financial condition.

***May 12, 2017 Form 10-Q***

111.    On May 12, 2017, the Company filed with the SEC its quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2017 (the "May 2017 10-Q"). The May 2017 10-Q was signed by Defendants Redman and Smith, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Redman and Smith attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

112.    With respect to related party transactions, the May 2017 10-Q stated, in relevant part:

> The Company leases its corporate offices from a related party pursuant to a five-year lease agreement with a five-year extension option requiring a base rent of $0.07 million per year. The Company also leases five properties adjacent to the corporate office from related parties with annual base rents of $0.03 million, $0.03 million, $0.09 million, $0.09 million, and $0.18 million.
>
> For the three months ended March 31, 2017 and 2016, the Company paid approximately $0.02 million and $0.03 million, respectively, for the use of transportation services from a related party. The Company also rents equipment in Elk City, Oklahoma from a related party. For the three months ended March 31, 2017 and 2016, the Company paid $0.05 million and $0.05 million, respectively.
>
> At March 31, 2017 and December 31, 2016, the Company had $0.01 million and $0 in payables, respectively, and approximately $0.03 million and $0.04 million in receivables, respectively, for related parties for services provided.
>
> All agreements pertaining to realty property and equipment were entered into during periods where the Company had limited liquidity and related parties secured them on behalf of the Company. All related party transactions are immaterial and have not been separately shown on the face of the financial statements.

113.    With respect to the Company's internal controls, the May 2017 10-Q stated, in relevant part:

We maintain disclosure controls and procedures that are designed to provide reasonable assurance that the information required to be disclosed by us in our reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure.

As required by Rule 13a-15(b) under the Exchange Act, we have evaluated, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this Quarterly Report. Based upon that evaluation, our principal executive officer and principal financial officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of March 31, 2017.

114.    With respect to changes in the Company's internal controls, the May 2017 10-Q further stated:

No changes in our system of internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) occurred during the quarterly period ended March 31, 2017 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

***August 11, 2017 Form 10-Q***

115.    On August 11, 2017, the Company filed with the SEC its quarterly report on Form 10-Q for the fiscal quarter ended June 30, 2017 (the "August 2017 10-Q"). The August 2017 10-Q was signed by Defendants Redman and Smith, and contained SOX certifications signed by Defendants Redman and Smith attesting to the accuracy of the August 2017 10-Q.

116.    With respect to related party transactions, the August 2017 10-Q stated, in relevant part:

The Company leases its corporate offices from a related party pursuant to a five-year lease agreement with a five-year extension option requiring a base rent of $0.07 million per year. The Company also leases five properties adjacent to the corporate office from related parties with annual base rents of $0.03 million, $0.03 million, $0.09 million, $0.09 million, and $0.18 million.

For the six months ended June 30, 2017 and 2016, the Company paid approximately $0.12 million and $0.06 million, respectively, for the use of transportation services from a related party. The Company also rents equipment in Elk City, Oklahoma from a related party. For the the six months ended June 30, 2017 and 2016, the Company paid $0.10 million and $0.10 million, respectively.

At June 30, 2017 and December 31, 2016, the Company had $0.04 million and $0 in payables, respectively, and approximately $0.02 million and $0.04 million in receivables, respectively, for related parties for services provided.

All agreements pertaining to real property and equipment were entered into during periods where the Company had limited liquidity and related parties secured them on behalf of the Company. All related party transactions are immaterial and have not been separately shown on the face of the financial statements.

117.    With respect to the Company's internal controls, the August 2017 10-Q stated, in

relevant part:

We maintain disclosure controls and procedures that are designed to provide reasonable assurance that the information required to be disclosed by us in our reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure.

As required by Rule 13a-15(b) under the Exchange Act, we have evaluated, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this Quarterly Report. Based upon that evaluation, our principal executive officer and principal financial officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of June 30, 2017.

118.    With respect to changes in the Company's internal controls, the August 2017 10-

Q further stated:

No changes in our system of internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) occurred during the

quarterly period ended June 30, 2017 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

***November 2, 2017 Form 10-Q***

119.    On November 2, 2017, the Company filed with the SEC its quarterly report on Form 10-Q for the fiscal quarter ended September 30, 2017 (the "November 2017 10-Q"). The November 2017 10-Q was signed by Defendants Redman, Smith, and Denholm, and contained SOX certifications signed by Defendants Redman and Smith attesting to the accuracy of the November 2017 10-Q.

120.    With respect to related party transactions, the November 2017 10-Q stated, in relevant part:

> The Company leases its corporate offices from a related party pursuant to a five-year lease agreement with a five-year extension option requiring a base rent of $0.07 million per year. The Company also leases five properties adjacent to the corporate office from related parties with annual base rents of $0.03 million, $0.03 million, $0.09 million, $0.09 million, and $0.18 million.
>
> For the nine months ended September 30, 2017 and 2016, the Company paid approximately $0.21 million and $0.12 million, respectively, for the use of transportation services from a related party. The Company also rents equipment in Elk City, Oklahoma from a related party. For the the nine months ended September 30, 2017 and 2016, the Company paid $0.14 million and $0.14 million, respectively.
>
> At September 30, 2017 and December 31, 2016, the Company had $0 million and $0 in payables, respectively, and approximately $0.04 million and $0.04 million in receivables, respectively, for related parties for services provided.
>
> All agreements pertaining to real property and equipment were entered into during periods where the Company had limited liquidity and related parties secured them on behalf of the Company. All related party transactions are immaterial and have not been separately shown on the face of the financial statements.

121.    With respect to the Company's internal controls, the November 2017 10-Q stated, in relevant part:

We maintain disclosure controls and procedures that are designed to provide reasonable assurance that the information required to be disclosed by us in our reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure.

As required by Rule 13a-15(b) under the Exchange Act, we have evaluated, under the supervision and with the participation of our management, including our principal executive officer, principal financial officer and principal accounting officer, the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this Quarterly Report. Based upon that evaluation, our principal executive officer, principal financial officer and principal accounting officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of September 30, 2017.

122.    With respect to changes in the Company's internal controls, the November 2017 10-Q further stated:

No changes in our system of internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) occurred during the quarterly period ended September 30, 2017 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

***March 27, 2018 Form 10-K***

123.    On March 27, 2018, the Company filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2017 (the "2017 10-K"). The 2017 10-K was signed by Defendants Redman, Smith, Denholm, Armour, Beal, Best, Blackwell, Coppedge, Douglas, Labbat, and Moore, and contained SOX certifications signed by Defendants Redman and Smith attesting to the accuracy of the 2017 10-K. The 2017 10-K reported $981 million in revenue, and $12.6 million in net income for the fiscal year ended December 31, 2017.

124.    With respect to related party transactions, the 2017 10-K incorporated by reference the following statements made in the 2018 Proxy Statement:

We lease our corporate offices from South Midkiff Partners LLC, an entity owned jointly by Dale Redman, David Sledge, Spencer Armour and Jeff Smith, pursuant to a five-year lease agreement with a five-year extension option requiring a base rent of $72,000 per year. We also lease five properties adjacent to the corporate office from South Midkiff Partners LLC with annual base rents of $30,000, $30,000, $90,000, $90,000 and $180,000.

We paid Dale Redman, our Chief Executive Officer, $265,278 for the year ended December 31, 2017, for reimbursement of costs incurred through use of his aircraft.

We rent certain flowback equipment from PD Properties, an entity jointly owned by Dale Redman, our Chief Executive Officer. For the year ended December 31, 2017, we paid $192,000 under this lease.

We lease a property adjacent to our corporate headquarters from Industrial Loop Partners, LLC, an entity wholly owned by an affiliate of Bandera Ventures. For the year ended December 31, 2017, we paid $335,194 under the lease. The lease has a remaining term of approximately six years. Mr. Blackwell, one of our directors, through his approximately 33% interest in Bandera Ventures, may be deemed an indirect beneficiary of this lease.

Jordan Frosch is a corporate sales manager for the company and the son-in-law of Dale Redman. Mr. Frosch received total compensation of approximately $438,212 for his services for the year ended December 31, 2017.

In November 2017, we entered into a five-year extension to an existing sand supply agreement to provide Texas-sourced frac sand ("Texas sand"), which is in high demand from our customers. Texas sand provided under the supply agreement will primarily be sourced from a mine located on land owned by an oil and gas exploration company in which our Chief Executive Officer, Dale Redman, owns a 44% interest. Accordingly, Mr. Redman may be considered an indirect beneficiary of payments made under the lease between our supplier and the landowner. The supply agreement was negotiated by officers of the Company without the involvement of Mr. Redman, and reviewed and approved by the Audit Committee pursuant to its authority under our Related Party Transactions Policy. In considering the approval of the supply agreement, the Audit Committee retained independent legal and commercial expertise to assist in the evaluation of the agreement's commercial terms. Following its evaluation, the Audit Committee determined that the pricing and other provisions of the agreement reflected market terms, that the agreement reflected an arm's length negotiation, and that entry into the agreement was advisable and in the best interests of the Company. For the year ended December 31, 2017, the Company did not make any payments for Texas sand under the supply agreement.

* * *

Any request for us to enter into a transaction with an executive officer, director, principal stockholder or any of such persons' immediate family members or affiliates, among others, in which the amount involved exceeds $120,000, must first be presented to our audit committee for review, consideration and approval. ***All of our directors and executive officers are required to report to the audit committee chair any such related person transaction***. In approving or rejecting the proposed agreement, our audit committee shall consider the facts and circumstances available and deemed relevant to the audit committee, including, but not limited to, whether the transaction is on terms comparable to those that could be obtained in arm's-length dealings with an unrelated third party, the extent of the related party's interest in the transaction and the conflicts of interest and corporate opportunity provisions of our certificate of incorporation. If we should discover related person transactions that have not been approved, the audit committee will be notified and will determine the appropriate action, including ratification, revision or termination of such transaction.

(Emphasis added).

125.    With respect to the Company's internal controls, the 2017 10-K stated, in relevant part:

We maintain disclosure controls and procedures that are designed to provide reasonable assurance that the information required to be disclosed by us in our reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure.

As required by Rule 13a-15(b) under the Exchange Act, we have evaluated, under the supervision and with the participation of our management, including our principal executive officer, principal financial officer and principal accounting officer, the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this report. ***Based upon that evaluation, our principal executive officer, principal financial officer and principal accounting officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of December 31, 2017***.

* * *

We are required to comply with the SEC's rules implementing Section 302 of the Sarbanes-Oxley Act of 2002, which requires our management to certify financial and other information in our quarterly and annual reports and provide an annual management report on the effectiveness of our internal control over financial reporting. We will not be required to make our first assessment of our internal

control over financial reporting until the year of our second annual report required to be filed with the SEC.

Our independent registered public accounting firm is not yet required to formally attest to the effectiveness of our internal controls over financial reporting, and will not be required to do so for as long as we are an "emerging growth company" pursuant to the provisions of the JOBS Act.

(Emphasis added).

126.    With respect to changes in the Company's internal controls, the 2017 10-K further stated:

No changes in our system of internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) occurred during the quarter ended December 31, 2017 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

### *April 26, 2018 Proxy Statement*

127.    The Company filed its 2018 Proxy Statement with the SEC on April 26, 2018. Defendants Redman, Armour, Beal, Best, Blackwell, Coppedge, Douglas, Labbat, and Moore solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[2]

128.    The 2018 Proxy Statement stated, regarding the Company's Code of Ethics, that, "our Code of Ethics & Conduct [] applies to all of our employees, as well as each member of the Board."

129.    The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Ethics was not followed, as evidenced by the numerous false and

---

[2] Plaintiffs' allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Ethics.

130.    The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ certain "pay-for-performance" elements, including cash incentive awards "based on the performance of the company as a whole, as well as the individual performance of each executive," while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

131.    The 2018 Proxy Statement also failed to disclose, *inter alia,* that: (1) certain of the Company's senior management, including the Company's former CEO and former CFO had been improperly reimbursed for at least $370,000; (2) the Individual Defendants had caused the Company to engage in undisclosed related party transactions, including a transaction with the Company's former CAO valued at approximately $3.6 million; (3) the Company had ineffective disclosure controls and procedures; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### *May 9, 2018 Form 10-Q*

132.    On May 9, 2018, the Company filed with the SEC its quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2018 (the "May 2018 10-Q"). The May 2018 10-Q was signed by Defendants Redman, Smith, and Denholm, and contained SOX certifications signed by Defendants Redman and Smith attesting to the accuracy of the May 2018 10-Q.

133.    With respect to related party transactions, the May 2018 10-Q stated, in relevant part:

The Company leases its corporate offices from a related party pursuant to a five-year lease agreement with a five-year extension option requiring a base rent of $0.1 million per year. The Company also leases five properties adjacent to the corporate office from related parties with annual base rents of $0.03 million, $0.03 million, $0.1 million, $0.1 million, and $0.2 million.

For the three months ended March 31, 2018 and 2017, the Company paid approximately $0.03 million and $0.02 million, respectively, for the use of transportation services from a related party. The Company also rents equipment in Elk City, Oklahoma from a related party. For the three months ended March 31, 2018 and 2017, the Company paid $0.05 million and $0.05 million, respectively.

At March 31, 2018 and December 31, 2017, the Company had $0 and $0.02 million in payables, respectively, and approximately $0.02 million and $0 in receivables, respectively, for related parties for services provided.

All agreements pertaining to real property and equipment were entered into during periods where the Company had limited liquidity and related parties secured them on behalf of the Company. All related party transactions are immaterial and have not been separately shown on the face of the financial statements.

134.    With respect to the Company's internal controls, the May 2018 10-Q stated, in relevant part:

We maintain disclosure controls and procedures that are designed to provide reasonable assurance that the information required to be disclosed by us in our reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to our management, including our principal executive officer, principal financial officer and principal accounting officer, as appropriate, to allow timely decisions regarding required disclosure.

As required by Rule 13a-15(b) under the Exchange Act, we have evaluated, under the supervision and with the participation of our management, including our principal executive officer, principal financial officer and principal accounting officer, the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this Quarterly Report. Based upon that evaluation, our principal executive officer, principal financial officer and principal accounting officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of March 31, 2018.

135.     With respect to changes in the Company's internal controls, the May 2018 10-Q

further stated:

> No changes in our system of internal control over financial reporting (as defined
> in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) occurred during the
> quarterly period ended March 31, 2018 that have materially affected, or are
> reasonably likely to materially affect, our internal control over financial reporting.

### *August 9, 2018 Form 10-Q*

136.     On August 9, 2018, the Company filed with the SEC its quarterly report on Form

10-Q for the fiscal quarter ended June 30, 2018 (the "August 2018 10-Q"). The August 2018 10-

Q was signed by Defendants Redman, Smith, and Denholm, and contained SOX certifications

signed by Defendants Redman and Smith attesting to the accuracy of the August 2018 10-Q.

137.     With respect to related party transactions, the August 2018 10-Q stated, in relevant

part:

> The Company leases its corporate offices from a related party pursuant to a five-
> year lease agreement with a five-year extension option requiring a base rent
> of $0.1 million per year. The Company also leases five properties adjacent to the
> corporate office from related parties with annual base rents of $0.03 million, $0.03
> million, $0.1 million, $0.1 million, and $0.2 million.
>
> For the six months ended June 30, 2018 and 2017, the Company paid
> approximately $0.06 million and $0.12 million, respectively, for the use of
> transportation services from a related party. The Company also rents equipment in
> Elk City, Oklahoma from a related party. For the six months ended June 30,
> 2018 and 2017, the Company paid $0.1 million and $0.1 million, respectively.
>
> At June 30, 2018 and December 31, 2017, the Company had $0.03
> million and $0.02 million in payables, respectively, and
> approximately $0 and $0 in receivables, respectively, for services provided by
> related parties.
>
> All agreements pertaining to real property and equipment were entered into during
> periods where the Company had limited liquidity and related parties secured them
> on behalf of the Company. All related party transactions are immaterial and have
> not been separately shown on the face of the financial statements.

138.    With respect to the Company's internal controls, the August 2018 10-Q stated, in

relevant part:

> We maintain disclosure controls and procedures that are designed to provide
> reasonable assurance that the information required to be disclosed by us in our
> reports that we file or submit under the Exchange Act is recorded, processed,
> summarized and reported within the time periods specified in the SEC's rules and
> forms and that such information is accumulated and communicated to our
> management, including our principal executive officer and principal financial
> officer, as appropriate, to allow timely decisions regarding required disclosure.
>
> As required by Rule 13a-15(b) under the Exchange Act, we have evaluated, under
> the supervision and with the participation of our management, including our
> principal executive officer and principal financial officer, the effectiveness of the
> design and operation of our disclosure controls and procedures (as defined in Rules
> 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period
> covered by this Quarterly Report. Based upon that evaluation, our principal
> executive officer and principal financial officer concluded that our disclosure
> controls and procedures were effective at the reasonable assurance level as
> of June 30, 2018.

139.    With respect to changes in the Company's internal controls, the August 2018 10-

Q further stated:

> No changes in our system of internal control over financial reporting (as defined
> in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) occurred during the
> quarterly period ended June 30, 2018 that have materially affected, or are
> reasonably likely to materially affect, our internal control over financial reporting.

***November 8, 2018 Form 10-Q***

140.    On November 8, 2018, the Company filed with the SEC its quarterly report on

Form 10-Q for the fiscal quarter ended September 30, 2018 (the "November 2018 10-Q"). The

November 2018 10-Q was signed by Defendants Redman, Smith, and Denholm, and contained

SOX certifications signed by Defendants Redman and Smith attesting to the accuracy of the

November 2018 10-Q.

141.    With respect to related party transactions, the November 2018 10-Q stated, in

relevant part:

The Company leases its corporate offices from a related party pursuant to a five-year lease agreement with a five-year extension option requiring a base rent of $0.1 million per year. The Company also leases five properties adjacent to the corporate office from related parties with annual base rents of $0.03 million, $0.03 million, $0.1 million, $0.1 million, and $0.2 million.

For the nine months ended September 30, 2018 and 2017, the Company paid approximately $0.3 million and $0.2 million, respectively, for the use of transportation services from a related party. The Company also rents equipment in Elk City, Oklahoma from a related party, and for the nine months ended September 30, 2018 and 2017, the Company paid $0.1 million and $0.1 million, respectively.

At September 30, 2018 and December 31, 2017, the Company had $0 and $0.02 million in payables, respectively, and approximately $0 and $0 in receivables, respectively, for services provided by related parties.

All agreements pertaining to real property and equipment were entered into during periods where the Company had limited liquidity and related parties secured them on behalf of the Company. All related party transactions are immaterial and have not been separately shown on the face of the financial statements.

142.    With respect to the Company's internal controls, the November 2018 10-Q stated,

in relevant part:

We maintain disclosure controls and procedures that are designed to provide reasonable assurance that the information required to be disclosed by us in our reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure.

As required by Rule 13a-15(b) under the Exchange Act, we have evaluated, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this Quarterly Report. Based upon that evaluation, our principal executive officer and principal financial officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of September 30, 2018.

143.    With respect to changes in the Company's internal controls, the November 2018

10-Q further stated:

> No changes in our system of internal control over financial reporting (as defined
> in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) occurred during the
> quarterly period ended September 30, 2018 that have materially affected, or are
> reasonably likely to materially affect, our internal control over financial reporting.

### March 1, 2019 Form 10-K

144.    On March 1, 2019, the Company filed with the SEC its annual report on Form 10-

K for the fiscal year ended December 31, 2018 (the "2018 10-K"). The 2018 10-K was signed

by Defendants Redman, Smith, Denholm, Armour, Beal, Berg, Best, Blackwell, Douglas,

Mitchell, and Moore, and contained SOX certifications signed by Defendants Redman and Smith

attesting to the accuracy of the 2018 10-K. The 2018 10-K reported $1.7 billion in revenue, and

$173.9 million in net income for the fiscal year ended December 31, 2018.

145.    With respect to related party transactions, the 2018 10-K incorporated by reference

the following statements made in the 2019 Proxy Statement:

> We lease our corporate offices from PD Properties, an entity owned by Dale
> Redman, pursuant to a five-year lease agreement with a five-year extension option
> requiring a base rent of $72,000 per year. We also lease five properties adjacent to
> the corporate office from South Midkiff Partners LLC, an entity owned jointly by
> Dale Redman, David Sledge, Spencer Armour and Jeff Smith, with annual base
> rents of $30,000, $30,000, $90,000, $90,000 and $180,000.
>
> We paid Dale Redman, our Chief Executive Officer, $393,034 for the year ended
> December 31, 2018, for reimbursement of costs incurred through use of his
> aircraft.
>
> We rent certain flowback equipment from PD Properties, an entity owned by Dale
> Redman, our Chief Executive Officer. For the year ended December 31, 2017, we
> paid $192,000 under this lease.
>
> We lease a property adjacent to our corporate headquarters from Industrial Loop
> Partners, LLC, an entity wholly owned by an affiliate of Bandera Ventures. For
> the year ended December 31, 2018, we paid $345,250 under the lease. The lease
> has a remaining term of approximately six years. Mr. Blackwell, one of our

directors, through his approximately 33% interest in Bandera Ventures, may be deemed an indirect beneficiary of this lease.

Jordan Frosch is our Sales Manager and the son-in-law of Dale Redman. Mr. Frosch received total compensation of approximately $530,511 for his services for the year ended December 31, 2018.

Sam Sledge is our Investor Relations Director and the son of David Sledge. Sam Sledge received total compensation of approximately $717,481 for his services for the year ended December 31, 2018.

Morgan Stovall is our Corporate Controller and the daughter of Jeffrey Smith. Ms. Stovall received total compensation of approximately $338,873 for her services for the year ended December 31, 2018.

In November 2017, we entered into a five-year extension to an existing sand supply agreement to provide Texas-sourced frac sand ("Texas sand"), which is in high demand from our customers. Texas sand provided under the supply agreement will primarily be sourced from a mine located on land owned by an oil and gas exploration company in which our Chief Executive Officer, Dale Redman, owns a 44% interest. Accordingly, Mr. Redman may be considered an indirect beneficiary of payments made under the lease between our supplier and the landowner. The supply agreement was negotiated by officers of the Company without the involvement of Mr. Redman, and reviewed and approved by the Audit Committee pursuant to its authority under our Related Party Transactions Policy. In considering the approval of the supply agreement, the Audit Committee retained independent legal and commercial expertise to assist in the evaluation of the agreement's commercial terms. Following its evaluation, the Audit Committee determined that the pricing and other provisions of the agreement reflected market terms, that the agreement reflected an arm's length negotiation, and that entry into the agreement was advisable and in the best interests of the Company. For the year ended December 31, 2018, the Company purchased $10,300,000 of Texas sand under the supply agreement, and Mr. Redman was an indirect beneficiary of approximately $300,000 in royalty payments.

* * *

Any request for us to enter into a transaction with an executive officer, director, principal stockholder or any of such persons' immediate family members or affiliates, among others, in which the amount involved exceeds $120,000, must first be presented to our audit committee for review, consideration and approval. ***All of our directors and executive officers are required to report to the audit committee chair any such related person transaction***. In approving or rejecting the proposed agreement, our audit committee shall consider the facts and circumstances available and deemed relevant to the audit committee, including, but not limited to, whether the transaction is on terms comparable to those that could be obtained in arm's-length dealings with an unrelated third party, the extent

of the related party's interest in the transaction and the conflicts of interest and corporate opportunity provisions of our certificate of incorporation. If we should discover related person transactions that have not been approved, the audit committee will be notified and will determine the appropriate action, including ratification, revision or termination of such transaction.

(Emphasis added).

146.    With respect to the Company's internal controls, the 2018 10-K stated, in relevant part:

We maintain disclosure controls and procedures that are designed to provide reasonable assurance that the information required to be disclosed by us in our reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure.

As required by Rule 13a-15(b) under the Exchange Act, we have evaluated, under the supervision and with the participation of our management, including our principal executive officer, principal financial officer and principal accounting officer, the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this report. Based upon that evaluation, our principal executive officer, principal financial officer and principal accounting officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of December 31, 2018.

147.    With respect to changes in the Company's internal controls, the 2018 10-K further stated:

No changes in our system of internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) occurred during the quarter ended December 31, 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

***April 23, 2019 Proxy Statement***

148.    The Company filed its 2019 Proxy Statement with the SEC on April 23, 2019. Defendants Redman, Armour, Beal, Berg, Best, Blackwell, Douglas, Mitchell, and Moore

solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[3]

149.    The 2019 Proxy Statement stated, regarding the Company's Code of Ethics, that, "our Code of Ethics & Conduct [] applies to all of our employees, as well as each member of the Board."

150.    The 2019 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Ethics was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Ethics.

151.    The Individual Defendants also caused the 2019 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ certain "pay-for-performance" elements, including cash incentive awards "based on the performance of the company as a whole, as well as the individual performance of each executive," while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

152.    The 2019 Proxy Statement also failed to disclose, *inter alia,* that: (1) certain of the Company's senior management, including the Company's former CEO and former CFO had been improperly reimbursed for at least $370,000; (2) the Individual Defendants had caused the Company to engage in undisclosed related party transactions, including a transaction with the

---

[3] Plaintiffs' allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

Company's former CAO valued at approximately $3.6 million; (3) the Company had ineffective disclosure controls and procedures; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### *May 7, 2019 Press Release*

153.    On May 7, 2019, the Company issued a press release announcing the Company's financial results for the fiscal quarter ended March 31, 2019. The press release was also attached as an exhibit to a report on Form 8-K filed with the SEC the next day. The press release reported $546 million in revenue and $69.8 million in net income for the quarter, and described the Company's expansion of its hydraulic fracturing capacity, stating the following:

**Operational Highlights and Fleet Expansion**

As previously announced, ProPetro expanded its fracturing capacity by 510,000 HHP, representing 8 fleets and related pump down equipment, through its transaction with Pioneer. This transaction increased the Company's total capacity to 1,415,000 HHP. Effective utilization of the Company's fracturing assets during the first quarter of 2019 was 27.0 fleets. ProPetro expects effective utilization in the second quarter of 2019 to be approximately 26.0 fleets.

The Company also plans to build and deploy two electrically powered DuraStim (for further information, see "The DuraStim Difference" section later in this release) fleets by the end of 2019. Each of these fleets consists of 36,000 HHP and related power equipment. Both of these fleets will be deployed to existing customers under dedicated agreements.

During the quarter the Company also expanded its cementing operation by deploying one additional unit, bringing total current cementing capacity to 21 units. Also, as previously announced, ProPetro plans to organically expand its cementing operation by 3 additional units this year as well as organically expand its coil tubing capacity by 1 additional unit.

* * *

**The *DuraStim* Difference**

Designed by AFGlobal Corporation's ("AFGlobal") Pressure Pumping Technologies group, the DuraStim frac pump, at 6,000 HHP, offers the equivalent

of three times the effective horsepower of a conventional frac unit, while operating at approximately 10% of the cyclic rate.

(Emphasis in original).

### *May 8, 2019 Form 10-Q*

154.     On May 8, 2019, the Company filed with the SEC its quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2019 (the "May 2019 10-Q"). The May 2019 10-Q was signed by Defendants Redman, Smith, and Denholm, and contained SOX certifications signed by Defendants Redman and Smith attesting to the accuracy of the May 2019 10-Q.

155.     With respect to related party transactions, the May 2019 10-Q stated, in relevant part:

> The Company leases its corporate offices from a related party with a base rent of $0.1 million per year. The Company also leases five properties adjacent to the corporate office from related parties with annual base rents of $0.03 million, $0.03 million, $0.1 million, $0.1 million, and $0.2 million.
>
> For the three months ended March 31, 2019 and 2018, the Company paid approximately $0.1 million and $0.03 million, respectively, for the use of transportation services from a related party. The Company also rents equipment in Elk City, Oklahoma from a related party, and for the three months ended March 31, 2019 and 2018, the Company paid $0.05 million and $0.05 million, respectively.
>
> At March 31, 2019 and December 31, 2018, the Company had $0.03 million and $0.01 million in payables, respectively, and approximately $0 and $0 in receivables, respectively, for transportation and equipment rental services provided by related parties.
>
> On December 31, 2018, we consummated the purchase of certain pressure pumping assets and real property from Pioneer Natural Resources USA, Inc. ("Pioneer") and Pioneer Pressure Pumping Services, LLC. The acquisition cost of the assets was comprised of approximately $110.0 million of cash and 16.6 million shares of our common stock. In addition, we entered into a real estate lease for a crew camp facility with Pioneer, as disclosed in Note 9. In connection with the consummation of the transaction, we became a service provider to Pioneer, providing pressure pumping and related services for a term of up to ten years. Revenue from services provided to Pioneer accounted for approximately 29.3% and 4.8% of our total revenue during the three months

ended March 31, 2019 and 2018, respectively. As of March 31, 2019, the balance
due from Pioneer for services we provided during the period amounted to $93.7
million and the amount due to Pioneer was $0.2 million. As of December 31,
2018, the balance due from Pioneer for services we provided during the period
amounted to $15.7 million and the amount due to Pioneer was $109.8 million.

156.    With respect to the Company's internal controls, the May 2019 10-Q stated, in

relevant part:

We maintain disclosure controls and procedures that are designed to provide
reasonable assurance that the information required to be disclosed by us in our
reports that we file or submit under the Exchange Act is recorded, processed,
summarized and reported within the time periods specified in the SEC's rules and
forms and that such information is accumulated and communicated to our
management, including our principal executive officer and principal financial
officer, as appropriate, to allow timely decisions regarding required disclosure.

As required by Rule 13a-15(b) under the Exchange Act, we have evaluated, under
the supervision and with the participation of our management, including our
principal executive officer and principal financial officer, the effectiveness of the
design and operation of our disclosure controls and procedures (as defined in Rules
13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period
covered by this Quarterly Report. Based upon that evaluation, our principal
executive officer and principal financial officer concluded that our disclosure
controls and procedures were effective at the reasonable assurance level as
of March 31, 2019.

157.    With respect to changes in the Company's internal controls, the May 2019 10-Q

further stated:

No changes in our system of internal control over financial reporting (as defined
in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) occurred during the
quarterly period ended March 31, 2019 that have materially affected, or are
reasonably likely to materially affect, our internal control over financial reporting.

### *June 28, 2019 Press Release*

158.    On June 28, 2019, the Company filed with the SEC a report on Form 8-K, which

included a press release announcing certain sales and revised agreements relating to the

Company's hydraulic fracturing assets. The press release stated, in relevant part:

- ProPetro Revises Previous Agreements with AFGlobal and Agrees to Purchase One Additional DuraStim® Fleet in 2019 in addition to Two Previously Announced, has Option to Purchase Up to Three Additional Fleets through End of 2020

- Announces that XTO Energy Inc. and Diamondback Energy are Expected to Deploy First Electrically Powered DuraStim® Hydraulic Fracturing Fleets in Permian Basin

- Announces Purchase of First Two TM2500 Gas Turbines to Power DuraStim® Fleets from Baker Hughes, a GE company

- Technology Expected to Significantly Reduce Costs and Create New Safety and Environmental Advantages for ProPetro Customers

159.    The statements in ¶¶ 108–126, ¶¶ 132–147, and ¶¶ 153–158, were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading.  Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) certain of the Company's senior management, including the Company's former CEO and former CFO had been improperly reimbursed for at least $370,000; (2) the Individual Defendants had caused the Company to engage in undisclosed related party transactions, including a transaction with the Company's former CAO valued at approximately $3.6 million; (3) the Company had ineffective disclosure controls and procedures; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

## The Truth Gradually Emerges

160.    On August 8, 2019, the Company filed with the SEC a report on Form 8-K (the "August 2019 8-K"), which included a press release announcing that the Company's quarterly report for the fiscal quarter ended June 30, 2019, as well as the accompanying conference call, would be delayed. The August 2019 8-K revealed that the Company's Audit Committee was in

the process of conducting a review of the Company's related party transactions, and had found that that since the IPO had been enacted on March 17, 2017, the Company had improperly reimbursed at least $370,000 to members of the Company's management, including Defendants Redman and Smith.

161.    Specifically, with respect to the Audit Committee's ongoing review, the August 2019 8-K stated:

> The Audit Committee (the "Committee") of the Company's board of directors (the "Board"), with assistance of independent outside counsel and accounting advisors, is in the process of conducting an internal review which initially focused on the Company's disclosure of agreements previously entered into by the Company with AFGlobal Corporation ("AFGlobal") for the purchase of Durastim® hydraulic fracturing fleets and effective communications related thereto. ***The review was later expanded to, among other items, review expense reimbursements and certain transactions involving related parties or potential conflicts of interest***. Substantial work related to the review has been completed to date, and the Committee expects to complete its review within the next 30 days. The Company is also in the process of implementing improvements to address certain findings identified to date in the review.
>
> As previously announced by the Company on June 28, 2019, the Company entered into revised agreements with AFGlobal pursuant to which it agreed to purchase one additional Durastim® hydraulic fracturing fleet, in addition to its agreements to purchase two Durastim® hydraulic fracturing fleets that were entered into during the quarter ended March 31, 2019. The Company also secured an option to purchase up to three additional fleets exercisable through the end of 2020. These revised agreements amended and/or replaced previous contracts to purchase a total of six DuraStim® fleets, including four DuraStim® fleets that the Company committed to purchase in April 2019.
>
> ***As part of its review of internal controls, the Committee identified, due to inadequate documentation associated with the Company's expense reimbursement practices, certain expenses reimbursed to members of senior management, including the chief executive officer and chief financial officer, that were incorrectly recorded as expenses of the Company*** and appropriately allocable to the officers individually. Each of these officers has reimbursed the Company in full for the identified amounts. ***The reimbursed amounts totaled approximately $370,000 since the Company's initial public offering in 2017. Of the total amounts, approximately $346,000 were attributable to the chief executive officer and approximately $18,000 were attributable to the chief financial officer.***

> Based on the review conducted to date, the Committee and management has not identified any failure to appropriately disclose related party transactions. The Committee and management have also not identified to date any items that would require revision or restatement of the Company's historical financial statements. However, the review is continuing and there is no assurance that additional items will not be identified. The Company does not intend to provide additional updates on the results of the review until it is concluded or the Company determines that further disclosure is appropriate or necessary.

(Emphasis added).

162.    The August 2019 8-K further disclosed that the Company expected to report a material weakness in its internal controls, stating:

> The Company's management is evaluating certain internal control deficiencies identified to date as a result of the review. Management has not yet completed this process but is likely to conclude that certain internal control deficiencies, rising to a level of a material weakness, resulted in the Company's disclosure controls and procedures not being effective. In the course of the continuing review, management may identify additional deficiencies that rise to a level of a material weakness.

163.    Following this disclosure, ProPetro's stock price fell from $17.34 at the close of trading on August 8, 2019, to $12.75 per share at the close of trading on August 9, 2019, a drop of over 26%.

164.    On August 16, 2019, the Company filed a subsequent report on Form 8-K with the SEC, revealing that on August 15, 2019, NYSE authorities had informed the Company that as a result of the Company's inability to timely file its quarterly report for the fiscal quarter ended June 30, 2019, the Company was not in compliance with the NYSE's listing requirements.

165.    On August 30, 2019, slightly over two weeks after the Company revealed the Audit Committee's investigation, Mark Howell, the Company's General Counsel announced his resignation. On this news, the price of the Company's stock declined by roughly 9.2%, falling

from $10.65 per share at the close of trading on August 30, 2019, to $9.67 per share at the close of trading on September 3, 2019.

166.    On October 9, 2019, the Company issued a press release announcing a significant restructuring of the Company's management as a result of the Audit Committee's investigation. The press release disclosed that while Defendant Redman would retain his position as CEO, he would no longer serve as the Company's principal executive officer, a role that would now be assumed by the Chair of the Board, Philip A. Gobe ("Gobe"). Additionally, effective as of October 3, 2019, Defendant Smith stepped down as CFO and was appointed Chief Administrative Officer of the Company, and Defendant Denholm resigned from his position as CAO.

167.    That same day, Yahoo Finance released an article titled, "ProPetro reshuffles top executives during probe into accounting disclosures," commenting on the restructuring of the Company's management. The article stated, in relevant part:

> Oilfield services firm ProPetro Holding Corp <PUMP.N> on Wednesday shuffled its top executives amid an internal investigation into equipment purchases and expense reimbursements.
>
> Co-founder Dale Redman will no longer serve as the principal executive but will retain the title of chief executive, the statement said. Jeffrey Smith, another co-founder and finance chief, was re-assigned as chief administrative officer. Both men agreed to reimburse the company for expenses that were billed to ProPetro.
>
> Wednesday's shakeup follows at least three other top management and board changes since July. Director Royce Mitchell and General Counsel Mark Howell left their positions in August, and the prior month, Chairman Spencer Armour III resigned. Armour remains a director, according to regulatory filings.

168.    On October 18, 2019, Reuters reported that the SEC had begun investigating ProPetro's internal controls and disclosure procedures. On this news, the price of the Company's stock fell by approximately 8.1%, from $8.61 per share at the close of trading on October 17, 2019, to $7.91 per share at the close of trading on October 18, 2019.

169.    On October 31, 2019, Culper Research published the Culper Research Report, which commented on the unreliability of the Audit Committee's findings, and further detailed the related party and internal control problems at the Company, in relevant part, as follows:

We find it farcical that the Company's October 9 press release named management as co-investigators alongside the Audit Committee in the probe, given that management themselves ought to be the very subject of the probe. Even so, ProPetro investors ought to recognize the name Alan Douglas, ProPetro board member and member of the Audit Committee. What investors may not know is that Dale Redman himself stated that Douglas is his personal accountant, while Douglas is listed as signatory on multiple undisclosed, purportedly outside entities that name ProPetro executives, employees, and board members.

* * *

The analyst's claims of real estate transactions being "already well known and previously disclosed" we believe to reference the Company's related party transactions involving PD Properties and South Midkiff Partners LLC, from whom ProPetro leases its corporate offices. This relationship has been disclosed in the Company's proxy statement. However, we found a concerning number of entities apparently involved in the oil & gas or related businesses created or directly tied to ProPetro co-founders Jackie Dale Redman (CEO) and Jeffrey D. Smith (former CFO, now CAO), in addition to numerous other ProPetro employees and ProPetro board members. It is extremely telling that the Company has not disclosed any of these entities, which we profile below.

* * *

Clarabby, Dahlia, and Conquistador Capital all remain active entities which list Ian Denholm as member. Midland County property records indicate that in December 2018, Clarabby Holdings LLC sold ProPetro two different properties, first at Stokes Av 3502 W, and second at Midkiff Road 0 S. The two properties in question list market values of $25,050 and $97,650, respectively.

These transactions were never disclosed by the Company in its 2018 Form 10-K or proxy statement. That said, we find it all the more troubling that at the time of Denholm's resignation, the Company claimed its internal probe was substantially complete, while at the same time, Denholm's separation agreement states he will assist in an ongoing investigation of these transactions. The Company again failed to disclose these transactions when given the opportunity in October 2019.

* * *

With numerous corporate governance failings, inability to file financials, and a reported ongoing SEC investigation, an additional capital raise would likely prove

punitive. Coupled with ProPetro's historical inability to produce cash flow and a utilization outlook that has reversed course from ebullient to dismal, we believe the Company's equity is ultimately worthless.

170.     On this news, the Company's stock price fell yet again, from $8.55 per share at the close of trading on October 30, 2019, to $7.75 per share at the close of trading on October 31, 2019, a loss in value of approximately 9.36%.

171.     On November 13, 2019, the Company issued a current report on Form 8-K disclosing additional weaknesses in the Company's internal controls, and revealing the previously undisclosed $3.6 million related party transaction, stating the following, in relevant part:

> The Audit Committee and management have not identified to date any items that would require restatement of the Company's previously reported balance sheets, statements of operations, statements of shareholders' equity or statements of cash flows. However, the Audit Committee's internal review has identified a number of internal control deficiencies. As a result of these internal control deficiencies, the Company's management has concluded that there were at least two material weaknesses that resulted in the Company's internal control over financial reporting and disclosure controls and procedures not being effective as of a prior date. While management continues to evaluate the impacts of the identified control deficiencies, management has concluded that at least one of these material weaknesses existed as of December 31, 2018.
>
> * * *
>
> The Audit Committee identified one related party transaction that was not previously disclosed. During 2018, (i) an entity ("Entity A") that is 50% owned by the Company's former Chief Accounting Officer (the "Former CAO") and 50% by the Former CAO's business partner (who is not affiliated with the Company) loaned approximately $770,000, and (ii) an entity that is owned 100% by the Former CAO ("Entity B") loaned approximately $57,000, to another entity that is owned 100% by the Former CAO's business partner ("Entity C"). The loaned funds were used by Entity C during 2018 to pay for a portion of the acquisition, development, and construction costs associated with an iron testing facility and a portion of the acquisition and development costs associated with a maintenance facility that were sold or leased to the Company. The approximately $827,000 of funds loaned by Entity A and Entity B to Entity C were repaid in full by Entity C, without interest.
>
> Similarly, during 2019, Entity A provided approximately $500,000 of funds to Entity C, which funds the Company understands were used during 2019 to pay for

a portion of the development and construction costs associated with the iron testing facility.

The Company purchased the iron testing facility from Entity C, reimbursed Entity C for certain development costs associated with the maintenance facility, and leased a property adjacent to the iron testing facility and the maintenance facility property from Entity C. In total, the Company has paid approximately $3,600,000 to Entity C, which includes $2,300,000 associated with the iron testing facility discussed above.

172.    Finally, on March 16, 2020, the Company issued a press release announcing that Defendant Redman had resigned as CEO, and that Defendant Smith had been removed as CFO and instead placed in the non-executive role of Special Advisor to the CEO.

173.    As of April 9, 2020, the Company's stock traded as low as $4.15 per share, a mere fraction of the $14.00 per share price of the Company's stock at the time of the IPO.

174.    As of the filing of this complaint, the Company has still not yet filed its quarterly reports for the fiscal quarters ended June 30, 2019 and September 30, 2019, or its annual report on Form 10-K for the fiscal year ended December 31, 2019.

## DAMAGES TO PROPETRO

175.    As a direct and proximate result of the Individual Defendants' conduct, ProPetro will lose and expend many millions of dollars.

176.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and certain of the Individual Defendants, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

177.    Such expenditures also include fees associated with the SEC's investigation into the Company.

178.   Additionally, these expenditures include, but are not limited to, compensation, bonuses, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company

179.   As a direct and proximate result of the Individual Defendants' conduct, ProPetro has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

180.   Plaintiff brings this action derivatively and for the benefit of ProPetro to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of ProPetro, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of Sections 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

181.   ProPetro is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

182.   Plaintiff is, and has been at all relevant times, a shareholder of ProPetro.  Plaintiff will adequately and fairly represent the interests of ProPetro in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

183.   Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

184.    A pre-suit demand on the Board of ProPetro is futile and, therefore, excused. At the time of filing of this action, the Board consists of Defendants Armour, Berg, Best, Blackwell, Douglas, and Moore (the "Director-Defendants"), along with non-parties Gobe and Michele V. Choka (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to four of the eight Directors who are on the Board at the time this action is commenced.

185.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

186.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

187.    Additional reasons that demand on Defendant Armour is futile follow. Defendant Armour has served as a Company director since February 2013. Defendant Armour has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his

duties to protect corporate assets. Furthermore, Defendant Armour signed, and thus personally made the false and misleading statements in the 2017 10-K and the 2018 10-K. His insider sales before the fraud was exposed, which yielded at least $4.2 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. For these reasons, Defendant Armour breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

188.    Additional reasons that demand on Defendant Berg is futile follow. Defendant Berg has served as a Company director since February 2019. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Berg signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, Defendant Berg breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

189.    Additional reasons that demand on Defendant Best is futile follow. Defendant Best has served as a Company director since January 2018. He also serves as the Chair of the Company's Audit Committee and as a member of the Compensation Committee. Defendant Best has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Best signed, and thus

personally made the false and misleading statements in the 2017 10-K and the 2018 10-K. For these reasons, Defendant Best breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

190.    Additional reasons that demand on Defendant Blackwell is futile follow. Defendant Blackwell has served as a Company director since December 2017. He also serves as the Chair of the Company's Compensation Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Blackwell has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Blackwell signed, and thus personally made the false and misleading statements in the 2017 10-K and the 2018 10-K. For these reasons, Defendant Blackwell breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

191.    Additional reasons that demand on Defendant Douglas is futile follow. Defendant Douglas has served as a Company director since March 2017. Defendant Douglas has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Douglas signed, and thus personally

made the false and misleading statements in the 2017 10-K and the 2018 10-K. For these reasons, Defendant Douglas breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

192.    Additional reasons that demand on Defendant Moore is futile follow. Defendant Moore has served as a Company director since March 2017. Defendant Moore has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Moore signed, and thus personally made the false and misleading statements in the 2017 10-K and the 2018 10-K. For these reasons, Defendant Moore breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

193.    Additional reasons that demand on the Board is futile follow.

194.    The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. For example, Defendants Redman, Smith, and Armour, along with David Sledge, the Company's Chief Operating Officer, are joint owners of South Midkiff Partners LLC, the entity from which the Company leases its corporate headquarters. Additionally, non-party Gobe is a current director of Pioneer Natural Resources Company ("Pioneer"), where Defendant Berg has worked for over 14 years, most recently serving

as Pioneer's Executive Vice President for Corporate/Vertically Integrated Operations since May 2017.

195.    Moreover, the Company maintains a supply agreement for the provision of Texas-sourced "frac sand" from land owned by an oil and gas company in which Defendant Redman owns a 44% interest. In connection with this supply agreement, as of December 31, 2018, the Company purchased $10.3 million worth of frac sand, of which Defendant Redman was an indirect beneficiary of approximately $300,000. The Company also currently leases a property adjacent to its corporate headquarters from an entity owned by an affiliate of Bandera Ventures, a commercial real estate firm co-founded by Defendant Blackwell, and in which Defendant Blackwell owns a 33% interest.

196.    Certainly, the Director-Defendants face a substantial likelihood of liability for causing the Company to fail to timely file with the SEC its quarterly reports for the fiscal quarters ended June 30, 2019 and September 30, 2019, and its annual report on Form 10-K for the fiscal year ended December 31, 2019.

197.    In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Section 14(a) of the Exchange Act. In violation of the Code of Ethics, the Director-Defendants failed to comply with the law. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

198.    ProPetro has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for ProPetro any part of the damages ProPetro suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

199.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

200.    The acts complained of herein constitute violations of fiduciary duties owed by ProPetro's officers and directors, and these acts are incapable of ratification.

201.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of ProPetro. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of ProPetro, there would be no directors' and officers'

insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

202.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause ProPetro to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

203.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

204.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

205.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

206.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate

commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

207.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

208.     Under the direction and watch of the Directors, the 2018 and 2019 Proxy Statements (the "Proxy Statements") failed to disclose, *inter alia*, that: (1) certain of the Company's senior management, including the Company's former CEO and former CFO had been improperly reimbursed for at least $370,000; (2) the Individual Defendants had caused the Company to engage in undisclosed related party transactions, including a transaction with the Company's former CAO valued at approximately $3.6 million; (3) the Company had ineffective disclosure controls and procedures; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

209.     The Individual Defendants also caused the Proxy Statements to be false and misleading with regard to executive compensation in that they purported to certain "pay-for-performance" elements, including cash incentive awards "based on the performance of the company as a whole, as well as the individual performance of each executive," while failing to

disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated. This caused the compensation to executives excessive and undeserved. Further, because the shareholders were unaware of the truth, their advisory votes on the executive compensation amounts were uninformed.

210.   In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including, but not limited to, election of directors, ratification of an independent public accounting firm, and the advisory approval of executive compensation.

211.   The false and misleading elements of the Proxy Statements led to the re-election of Defendants Redman, Armour, Beal, Best, Blackwell, Coppedge, Douglas, Labbat, and Moore, which allowed them to continue breaching their fiduciary duties to ProPetro.

212.   The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

213.   Plaintiff on behalf of ProPetro has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

214.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

215.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of ProPetro's business and affairs.

216.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

217.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of ProPetro.

218.    In breach of their fiduciary duties owed to ProPetro, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) certain of the Company's senior management, including the Company's former CEO and former CFO had been improperly reimbursed for at least $370,000; (2) the Individual Defendants had caused the Company to engage in undisclosed related party transactions, including a transaction with the Company's former CAO valued at approximately $3.6 million; (3) the Company had ineffective disclosure controls and procedures; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

219.    The Individual Defendants also failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

220.    In breach of their fiduciary duties, three of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

221.    Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls, and caused the Company to fail to timely file certain of its financial statements with the SEC.

222.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of ProPetro's securities and disguising insider sales.

223.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of ProPetro's securities and engaging in insider sales.

224.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

225.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, ProPetro has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

226.     Plaintiff on behalf of ProPetro has no adequate remedy at law.

### THIRD CLAIM

#### Against Individual Defendants for Unjust Enrichment

227.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

228.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, ProPetro.

229.     The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from ProPetro that was tied to the performance or artificially inflated valuation of ProPetro, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

230.     Plaintiff, as a shareholder and a representative of ProPetro, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

231.     Plaintiff on behalf of ProPetro has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Abuse of Control

232.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

233.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence ProPetro, for which they are legally responsible.

234.    As a direct and proximate result of the Individual Defendants' abuse of control, ProPetro has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, ProPetro has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

235.    Plaintiff on behalf of ProPetro has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

236.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

237.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of ProPetro in a manner consistent with the operations of a publicly-held corporation.

238.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, ProPetro has sustained and will continue to sustain significant damages.

239.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

240.    Plaintiff on behalf of ProPetro has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

241.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

242.    The Individual Defendants caused the Company to pay themselves excessive salaries, bonuses, fees, stock grants, car allowances and also caused the Company to pay out loans, among other inappropriate things, to the detriment of the shareholders and the Company.

243.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused ProPetro to waste valuable corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

244.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

245.    Plaintiff on behalf of ProPetro has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of ProPetro, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached their fiduciary

duties to ProPetro;

(c)     Determining and awarding to ProPetro the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing ProPetro and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect ProPetro and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2.  a provision to permit the shareholders of ProPetro to nominate at least four candidates for election to the board; and

3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding ProPetro restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: April 17, 2020

KENDALL LAW GROUP, PLLC
JOE KENDALL
Bar No. 11260700

*/s/ Joe Kendall*
JOE KENDALL
3811 Turtle Creek Blvd., Suite 1450
Dallas, TX 75219
Telephone: 214/744-3000
Fax: 214/744-3015
jkendall@kendalllawgroup.com

THE BROWN LAW FIRM, P.C.
TIMOTHY BROWN
240 Townsend Square
Oyster Bay, NY 11771
Telephone: 516/922-5427
Fax: 516/344-6204
tbrown@thebrownlawfirm.net